828 P.2d 781

**CAPITOL CASTINGS, INC., Appellant,**

v.

**ARIZONA DEPARTMENT OF ECONOMIC SECURITY, an agency, and Duane K. Halsey, Jerry B. Chavez, Jonas Atlason, Daniel P. Arnold, Mark Allen, John Petrucci, Arthur H. Rood, Jr., Peter B. Valencia, Lloyd Ware, Olen L. Honeywell, Scott M. Litow, Frank Marin, Frank Matus and Reynaldo J. Navarro, Appellees.**

Nos. 1 CA–UB 90–051 to
1 CA–UB 90–064.

Court of Appeals of Arizona,
Division 1, Department D.

March 26, 1992.

Twitty, Sievwright & Mills by N. Douglas Grimwood and Janet L. Feltz, Phoenix, for appellant.

Grant Woods, Atty. Gen. by Rick E. Olson and Bonnie E. Elber, Asst. Attys. Gen., Phoenix, for appellees.

## OPINION

McGREGOR, Judge.

This case arose when an employer closed one of its plants and chose to pay laid-off employees their usual salaries for 60 days after their last day of work rather than provide the 60–day notice of plant closing required by the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C.A. §§ 2101–09 (1989) (WARN).[1] The issue is whether the payments to the employees constitute "wages" for purposes of state unemployment compensation benefits. *See* Ariz.Rev.Stat.Ann. ("A.R.S.") § 23–622.A (1990). We conclude the payments are not wages and therefore affirm the decision of the Unemployment Insurance Appeals Board finding the employees eligible to receive unemployment compensation for the 60–day period following the plant closure.

## I.

In October 1989, appellant Capitol Castings, Inc. (Capitol) closed a portion of its Tempe, Arizona, plant and laid off 126 employees without prior notice. In an attempt to comply with the spirit if not the letter of WARN, Capitol retained the employees on its payroll for 60 days. During that 60–day period, the employees did not perform services for Capitol but received their normal salary and benefits (the payments), even if they accepted work elsewhere.

1. WARN provides: "An employer shall not order a plant closing or mass layoff until the end of a 60–day period after the employer serves written notice of such an order ... to each

Subsequently, 14 of the employees (the applicants) applied for unemployment benefits for the same 60–day period. Capitol protested each application, contending that because the payments constituted "wages" under A.R.S. § 23–622.A, the applicants were not "unemployed" and therefore were not eligible for unemployment benefits. *See* A.R.S. § 23–621. The appeal tribunal of the Arizona Department of Economic Security (DES), in decisions affirmed by the DES appeals board, concluded the payments were not wages and found the applicants eligible to receive unemployment compensation. We accepted Capitol's applications for appeal pursuant to A.R.S. § 41–1993 and consolidated the 14 cases.

## II.

The terms of Arizona's Employment Security Act, A.R.S. §§ 23–601 to –798, govern an applicant's eligibility to receive state unemployment benefits. To qualify for state benefits, an applicant must be "unemployed" as defined by A.R.S. § 23–621. Under the terms of that statute, an applicant is deemed unemployed for any period during which "[1] he performs no services and [2] with respect to which no wages are payable to him...." A.R.S. § 23–621. Capitol agrees the applicants performed no services during the 60–day period, thereby satisfying the first requirement of the statute. The determinative issue on appeal therefore is whether the payments made by Capitol during the 60–day period constitute "wages" payable to the applicants. If so, the applicants are not eligible for unemployment compensation for the 60–day period. If not, the applicants are eligible.

## A.

For purposes of unemployment compensation, the Arizona legislature has defined wages as

all remuneration *for services* from whatever source, including commissions, bo-

representative of the affected employees or ... to each affected employee." 29 U.S.C.A. § 2101(a) (1989).

nuses and fringe benefits and the cash value of all remuneration in any medium other than cash.

A.R.S. § 23–622.A (emphasis added). At first glance, the statutory definition appears dispositive because the parties agree the applicants performed no services during the 60–day period. The applicants assert the payments thus cannot be remuneration *for services* and therefore cannot bar them from receiving unemployment compensation.

The issue, however, is not quite so straightforward. The regulations adopted by DES, the agency charged with enforcing and applying Arizona's unemployment compensation statutes, distinguish between "backpay" and "dismissal or separation pay." Under those regulations, "backpay" constitutes remuneration for services, or wages, but "dismissal or separation pay" does not. Ariz.Comp.Admin.R. & Regs. ("A.A.C.") R6–3–55460.A and .C (1990). As the parties recognize, the classification of payments under the regulatory definitions is crucial to resolving the issue before us.

▮▮▮ The classification of payments for purposes of unemployment compensation eligibility is a question of law. *E.g., Kamaura v. Agsalud,* 715 P.2d 1278, 1280 (Haw.App.1986) (whether benefits received by unemployment compensation applicant are "sick pay" is a question of law); *Denver v. Industrial Comm'n,* 707 P.2d 1008, 1009 (Colo.App.1985) (whether payments received by unemployment compensation applicant are "wages" is a question of law). Although "we are free to draw our own legal conclusions in determining if the appeals board properly interpreted the law," *Avila v. Arizona Dep't of Economic Sec.,* 160 Ariz. 246, 248, 772 P.2d 600, 602 (App. 1989), an administrative agency's interpretation of statutes and its own regulations is entitled to great weight. *Metro Mobile CTS, Inc. v. Newvector Comm., Inc.,* 661

F.Supp. 1504, 1512 (D.Ariz.1987) *aff'd,* 892 F.2d 62 (9th Cir.1989).

### B.

In its regulations, DES defines "dismissal or separation pay" in the following broad terms:

1. Dismissal or separation payments include, but are not limited to, *wages in lieu of notice,* dismissal payments, and severance payments, and may be in accordance with the contract of employment or an unilateral policy of the employer.

2. Payments may be made as a lump sum at the time of termination of services ... [or] *the employer may continue to include the worker on his payroll for one or more pay periods following the termination of the worker's services.*

A.A.C. R6–3–55460.A (emphasis added).

Capitol does not really dispute that the payments in question fall within the general category of "wages in lieu of notice." [2] Capitol points out, however, that the regulation includes only dismissal or separation payments made "either in accordance with the contract of employment or an unilateral policy of the employer." A.A.C. R6–3–55460.A.1. Because no employment contract required Capitol to offer dismissal payments in lieu of notice, the regulatory definition applies only if Capitol made the payments pursuant to a "unilateral policy." Capitol contends that because it was bound by WARN to give a 60–day notice and also believed keeping the plant operating for the 60–day period was "economically unfeasible," the decision to pay was compelled and not a unilateral decision.

▮▮▮ We do not agree the phrase "unilateral decision" should be interpreted so narrowly as to include only those decisions that are free from all external economic,

---

**2.** The DES regulations do not further define "wages in lieu of notice." Generally, however, the term refers to "payment[s] made under the circumstances where the employing unit, not having given an advance notice of separation to an employee, and irrespective of the length of service of the employee, makes a payment to the

employee equivalent to the wages which he could have earned had he been permitted to work during the period of notice." *Bolta Products Div. v. Director of Div. of Employment Sec.,* 356 Mass. 684, 255 N.E.2d 357, 361 (1970). Capitol's payments to its laid-off employees fall within this definition.

legal or moral considerations. Although this employer's business decision to forego WARN's notice requirement and make the payments without requiring services from the employees may have been influenced by factors beyond its direct control, including the provisions of federal law, the uncontested fact is that Capitol, and no other entity, decided to close the plant without notice.

■ A conclusion that the payments in question fall within those categories of payments excluded from "wages" is consistent both with the statutory definition of wages and with the legislative intent to give the Employment Security Act broad and liberal coverage. *See Gaskin v. Wayland,* 61 Ariz. 291, 295, 148 P.2d 590, 591 (1944). As noted above, Arizona's definition of wages under its Employment Security Act excludes severance and dismissal payments and wages in lieu of notice, whether made pursuant to contract or pursuant to a unilateral decision of the employer. While most other states also exclude some types of payments from "wages," few states have adopted exclusions as broad as those used in Arizona. *See, e.g., Bolta Products Div. v. Director of Div. of Employment Sec.,* 356 Mass. 684, 255 N.E.2d 357 (1970) (payments in lieu of notice are wages, but severance payments are not wages); *Department of Indus. Relations v. Deslattes,* 372 So.2d 867 (Ala.Civ. App.1979) (payments made by employer voluntarily are not wages, but payments made pursuant to contract or other legal obligation are wages); *Pyrdol v. Administrator, Unemployment Comp. Act,* 233 A.2d 146 (Conn.Super.Ct.1967) (severance payments are wages). For these reasons, we agree with the appeal tribunal's decision that the payments by Capitol fall within the definition of dismissal or separation payments.

## C.

■ Capitol also asserts that, regardless of Arizona's definition of backpay,[3] the language and legislative history of WARN disclose that Congress intended to classify payments made in compliance with WARN as backpay. Congress did refer to payments made by employers pursuant to WARN as "backpay."[4] We do not agree, however, that the federal description of payments for purposes of WARN controls state classification of the payments for purposes of unemployment compensation eligibility.

WARN simply does not address the issue before us. Although the Act requires a 60–day notice of mass layoffs and defines an employer's liability for failure to comply with the notice requirement, it does not address the classification to be given payments made *in anticipation of* violating its notice provision. Additionally, neither in WARN itself nor in its legislative history did Congress express an intent to control eligibility for state unemployment compensation. Because the federal statute does not purport to govern the classification of payments made for purposes of state unemployment compensation, we will not assume Congress intended its use of the term "backpay" to control a recipient's eligibility for state unemployment benefits. *See, e.g., Green v. Indus. Claim Appeals Office,* 765 P.2d 1064, 1065 (Colo.App.1988) (court not required to give particular effect to a payment from a federal welfare program for the purpose of determining a claimant's eligibility for an award of unemployment compensation benefits because the program "did not purport ... to govern the administration, usage, or characterization of any [payments] once they were properly distributed"). We therefore find no basis

---

**3.** For purposes of Arizona's unemployment compensation statutes, backpay awards include, but are not limited to, awards ... [u]nder the Fair Labor Standards Act for unpaid overtime or minimum wages, but not for liquidated damages thereunder; and ... [o]f the National Labor Relations Board or by private agreement, consent or arbitration for loss of pay by reason of wrongful discharge.

A.A.C. R6–3–55460.C.3.a and b.

**4.** For example, WARN provides that "[a]ny employer who orders a plant closing or mass layoff in violation of ... this title shall be liable to each aggrieved employee ... for ... *backpay* for each day of violation...." 29 U.S.C.A. § 2104(a) (1989) (emphasis added).

in WARN for varying the classification required by state law for Capitol's payments to its employees.

### D.

Finally, Capitol argues that allowing an applicant to receive both his normal salary and unemployment compensation for the same period results in a windfall to the applicant and is contrary to the policy of Arizona's Employment Security Act.[5] We again disagree.

Alleviating the burden on unemployed persons is an important but not the only purpose of Arizona's Employment Security Act. A second purpose of the Act is "to encourage employers to provide more stable employment." A.R.S. § 23–601. Requiring an employer to assume responsibility for employees who are laid off without fault on their part tends to further that purpose.

 In *AT & T Information Systems, Inc. v. Arizona Dep't of Economic Sec.*, 154 Ariz. 236, 741 P.2d 703 (App.1987), we considered an employer's contention that employees who received not only payments pursuant to a voluntary layoff program but also unemployment compensation for the same period garnered a windfall. We rejected the employer's contention and held that the employer's "independent obligations under the [program do not] relieve it of responsibility under the unemployment insurance laws." *Id.* at 239, 741 P.2d at 706. Similarly, Capitol's obligation imposed by WARN is independent of its obligation under Arizona's Employment Securi-

ty Act. An employer's obligation to provide notice of a plant closing or mass layoff does not relieve the employer of its responsibility under state unemployment compensation laws.

### III.

For the foregoing reasons, we affirm the decisions of the Unemployment Insurance Appeals Board.

GERBER, P.J., and SHELLEY, JJ., concur.

---

5. The policy of our Employment Security Act is set forth in A.R.S. § 23–601:

   As a guide to the interpretation and application of this chapter, the public policy of this state is declared to be as follows:

   Economic insecurity due to unemployment is a serious menace to the health, morals and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this greatest hazard of eco-

nomic life. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this state require the enactment of this measure, under the police powers of the state, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.